# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT WINCHESTER

PHILLIP ROBERTS,                )
                                )
        Plaintiff,              )
                                )
v.                              )        No.:    4:18-CV-4-SKL
                                )
COFFEE COUNTY, TENNESSEE,       )
JOHN CARROLL,                   )
CHASE STRANGE, and              )
DAKOTA LILES,                   )
                                )
        Defendants.             )

## <u>MEMORANDUM OPINION</u>

Coffee County, Tennessee, John Carroll, Chase Strange, and Dakota Liles ("Defendants") have filed a motion for summary judgment in this prisoner's civil rights action for violation of 42 U.S.C. § 1983 [Doc. 49]. Philip Roberts ("Plaintiff") has filed a response in opposition to the motion [Doc. 56], and Defendants have filed a reply thereto [Doc. 59]. Upon consideration of the parties' pleadings, the competent summary judgment evidence, and the applicable law, the Court finds that summary judgment should be **GRANTED**, and this action should be **DISMISSED**.

## I.      ALLEGATIONS OF THE COMPLAINT

Plaintiff was a pretrial detainee at the Coffee County Jail during all times relevant to this lawsuit [Doc. 1 p. 1]. On May 11, 2017, Plaintiff was attacked by three other inmates and asked jail officials, including Defendant Carroll, to render aid and move him to another part of the jail [*Id*. at 2]. Defendant Carroll refused to move Plaintiff, and on May 17, 2017, Plaintiff was attacked by five inmates, three of whom were involved in the earlier attack [*Id*.]. Plaintiff alleges that Defendant Strange observed this second attack from the watch tower but failed to intervene [*Id*. at

2-3]. After this attack, Plaintiff again requested to be moved to a different location and for jail officials to "deal with the offending inmates," but jail officials "ignored his pleas" [*Id.* at 3].

Plaintiff was assaulted a third time on May 22, 2017, by several inmates, including the inmates from the previous attacks [*Id.*]. Plaintiff again requested that jail officials "render aid, [] move him to a safer location, and to deal with the offending inmates," but his pleas were ignored [*Id.*]. According to Plaintiff, all three attacks resulted in visible injuries and aggravated Plaintiff's pre-existing leg injury [*Id.* at 2-3].

On June 9, 2017, Defendant Liles slammed Plaintiff's arm in a metal hatch, causing Plaintiff severe pain and suffering [*Id.* at 4]. Plaintiff had previously spoken with Defendant Liles about a food transfer with another inmate, and Defendant Liles slammed the hatch on Plaintiff's arm when he reached his arm out of his cell to collect his food [*Id.* at 5]. Defendant Liles leaned against the hatch for several moments, thereby trapping Plaintiff's arm in the hatch [*Id.*].

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when the pleadings and evidence, viewed in a light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a),(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is deemed "material" if resolving that fact in favor of one party "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To establish an entitlement to summary judgment, the moving party must demonstrate that the nonmoving party cannot establish an essential element of his case for which he bears the ultimate burden of proof at trial. *Celotex*, 477 U.S. at 322; *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993).

Once the motion is properly supported with competent evidence, the nonmovant must show that summary judgment is inappropriate by setting forth specific facts showing there is a genuine

issue for trial. *Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 249. If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine dispute as to a material fact. *Anderson*, 477 U.S. at 248. If no proof is presented, however, the Court does not presume that the nonmovant "could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 889 (1990)).

The very purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial." Advisory Committee Note to the 1963 Amendments to Rule 56. Indeed, "[t]he amendment is not intended to derogate from the solemnity of the pleadings[;] [r]ather, it recognizes that despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id.* The non-moving party (the plaintiff in this case), must come forward with proof to support each element of his claim. The plaintiff cannot meet this burden with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), "conclusory allegations," *Lujan*, 497 U.S. at 888, or by a mere "scintilla" of evidence, *Anderson*, 477 U.S. at 252. It would undermine the purposes of summary judgment if a party could defeat such a motion simply by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 888. Therefore, in considering a motion for summary judgment, a court must determine whether the non-moving party's allegations are *plausible*. *Matsushita,* 475 U.S. at 586. (emphasis added). "[D]etermining whether a complaint states a plausible claim for relief. . . [is] context-specific[,] . . . requir[ing] the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (discussing plausibility of claim as a requirement to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6)).

In considering a motion for summary judgment, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, . . . [the ultimate decision becomes]. . . a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on the motion for summary judgment." *Id.* at 380.

## III.   SUMMARY JUDGMENT EVIDENCE

### A.   Alleged Inmate Assaults

On May 11, 2017, Plaintiff was booked in the Coffee County Jail ("the jail") and assigned to a cell in AD pod [Doc. 49-4 P. 5; Doc. 49-5 p. 2]. The AD pod, one of the few pods where inmates have an opportunity to work, typically houses nonviolent offenders and "is not known to have any pervasive issues with inmate on inmate assaults" [Doc. 49-4 p. 1 ¶ 5]. AD pod is also routinely monitored by deputies both on the floor and in the jail's watch tower [*Id.* at ¶ 4].

Officer Jonathan Carroll was one of two classification workers at the Coffee County Jail at the time Plaintiff was booked [Doc. 49-1 ¶ 4]. Plaintiff's intake assessment did not reveal any indicators that would suggest the need for protective custody, nor did it reveal anything else that would indicate Plaintiff would be at a higher risk for assault [*Id.* at ¶ 7]. For example, Plaintiff was booked on nonaggressive charges, he was not suicidal, affiliated with a gang, or known to have physical altercations with other inmates [*Id.* at ¶ 8]. Officer Carroll testified that he had no knowledge of Plaintiff having an issue with any inmates prior to or during his stay in AD pod, and he had no reason to believe that Plaintiff was at risk for assault while housed in AD pod [Doc. 49-1 at ¶ 9, ¶ 14].

Plaintiff, displeased with his cell assignment due to his belief that AD pod was the "snitch" pod, attempted to refuse his cell placement, telling Officer Carroll that he "wasn't going to a rat pod" [Doc. 49-5 p. 3]. Plaintiff told Officer Carroll that the pod contained informants that "have tried to set [Plaintiff] up" and that he did not "want to be around" [*Id.*]. Plaintiff advised Officer Carroll that Plaintiff would "have a problem" in AD pod [*Id.*]. Officer Carroll responded that he would "look into it" [*Id.*]. However, Plaintiff did not tell Officer Carroll the names of the individuals in the AD pod that he was concerned about, and Officers Carroll and Strange had no knowledge of any issues between Plaintiff and Steven Bostic, Kevin Smith, Nathaniel Farris, or Timothy Gifford, the inmates who would later allegedly assault Plaintiff [Doc. 49-1 ¶ 14; Doc. 49-2 ¶ 6].

During lockdown on the evening of May 11, 2017, Plaintiff smoked cigarettes that he had sneaked into the jail [Doc. 49-5 p. 4]. The next day, Inmates Farris, Gifford, and Smith approached Plaintiff and demanded the tobacco [*Id.*]. Plaintiff had stored the tobacco in his anus "because he figured they were going to try to make [him] give them what [he had]" [*Id.*]. When Plaintiff refused, Farris hit and kicked Plaintiff in the face, head, side, ribs, and legs [*Id.* at 4-5]. Plaintiff states he suffered a busted lip, busted eye, and bruising [*Id.* at 5]. Plaintiff maintains that he reported the incident to Defendant Strange, stating, "Look at me, I need out this unit. . . . I need Carroll back here, look at me, get me out this unit" [*Id.* at 6]. Plaintiff avers that Defendant Strange responded that he would tell Defendant Carroll and get back to Plaintiff [*Id.* at 6]. Plaintiff claims after the assault on May 11, 2017, he made numerous reports of the assault on the kiosk grievance system and submitted medical requests, but he did not receive a response to any of his requests or grievances [*Id.* at 6].

Plaintiff continued to smoke tobacco on lockdown, and on May 15, 2017, Plaintiff was again approached by the same inmates and again refused to turn over the tobacco [*Id.* at 6-7].

Plaintiff contends that inmates Farris and Gifford kicked and punched him multiple times for refusing to give them the tobacco [*Id*. at 7].  Plaintiff claims that Officer Strange was the guard in the tower on that date and asserts that Officer Strange had, by that time, been previously reprimanded for sleeping on duty, failing to attend work, insubordination, and failing to perform duties [Doc. 56-2 ¶ 7; Doc. 56-5].  On May 22, 2017, Plaintiff still had some tobacco and was assaulted for a third time by the same inmates [Doc. 49-5 p. 8].

Officers Carroll and Strange testified that they had no knowledge of Plaintiff being assaulted by any inmate in May 2017, nor did they have knowledge of Plaintiff having issues with Inmates Farris, Bostic, Gifford, or Smith prior to or during Plaintiff's stay in AD pod [Doc. 49-1 ¶ 14; Doc. 49-2 ¶ 6].  Officers Carroll and Strange further state that they had no knowledge of any request made by Plaintiff to be moved out of AD pod due to a threat to his health or safety prior to any of the alleged inmate assaults occurring [Doc. 49-1 ¶ 18; Doc. 49-2 ¶ 10].  Such a request, if one had been made, would have been documented [Doc. 49-4 p. 3 ¶ 9].  Nevertheless, on May 25, 2017, Plaintiff was transferred out of AD Pod [Doc. 56-3 p. 2].

On June 1, 2017, Plaintiff submitted both a kiosk grievance and a kiosk medical request regarding the alleged assaults [Doc. 49-4 p. 9, 17].  Plaintiff made additional grievances related to the purported attacks on June 2, 3, and 4, 2017, and he submitted additional medical requests on June 2 and 4, 2017 [*See id*.].  Plaintiff was evaluated by a medical provider for injuries related to the assaults on June 7, 2017 [*Id*. at 32, 35, 36].  At that time, Plaintiff reported that he had been "jumped 17 days ago" and complained that he could hardly walk, and that he had broken ribs, a broken pelvis, knee pain, and ear and back pain [*Id*. at 36].  The provider noted that Plaintiff's x-ray of his pelvis just days earlier showed no anatomic abnormality, that he had full range of motion in his knees, full range of motion in his back, no bruising or swelling deformity, and that his ears were clear with no redness [*Id*.].  The provider's impression was that Plaintiff suffered "no broken

bones or bruising," and that Plaintiff was "malingering" [*Id*. at 36]. Plaintiff was prescribed Naproxen for 14 days, although the medical provider testified that Plaintiff had no swelling [Doc. 59-1 p. 6-7]. The medical provider further testified that even though her evaluation occurred approximately 17 days after the last alleged assault, Plaintiff's body would have borne some physical evidence of the injuries alleged by Plaintiff if they had, in fact, occurred [*See, generally*, Doc. 59-1].

### B.     Alleged Assault by Officer Dakota Liles

On June 9, 2017, Plaintiff and another inmate had an agreement to swap food [Doc. 49-5 p. 9-10]. Plaintiff communicated this to Officer Liles, who said that he did not have a problem with the agreement [*Id*. at 10]. However, according to Plaintiff, when Plaintiff reached to get the tray through the pie flap of his cell door to retrieve the tray, Officer Liles slammed the door on Plaintiff's arm and held it there for 15-20 seconds [*Id*.]. Conversely, Officer Liles denies that he used any force on Plaintiff, and he states that the incident alleged by Plaintiff never occurred [Doc. 49-3 ¶ 4-5].

Plaintiff never received any medical treatment for his arm [Doc. 49-5 p. 11]. However, Plaintiff believes that he "ripped his rotator cuff" during the incident, as he gets a sharp pain in his shoulder if he moves his arm too fast or attempts to lift something too heavy [*Id*.]. Although the grievance is not in the kiosk reports, Plaintiff states that he filed a grievance about the alleged June 9, 2017, assault [*Id*.].

### C.     Coffee County Policies and Records

Classification officers at the Coffee County Jail work to place inmates in appropriate levels of custody based on several factors, including an inmate's current/past convictions, current/past institutional behavior, pending charges or holds in other jurisdictions, and any other information that may be deemed appropriate with regard to the inmate's personal safety or the security of the

facility [Doc. 49-4 p. 2 ¶ 6]. Classification officers receive Tennessee Corrections Institute ("TCI") and additional training on how to classify inmates in the appropriate level of custody based on these factors [*Id*.].

All corrections officers are trained on how to handle inmate requests to be moved within the jail [*Id*. ¶ 7]. Absent an obvious or emergent need to move the inmate, officers first attempt to determine the validity of the expressed concern and whether there is a legitimate need for an inmate to be moved [*Id*.]. Officers consider a variety of factors in determining the inmate's request, including the inmate's temperament, whether the inmate is acting worried or upset, if the inmate has any signs or markings of assault, if other inmates confirm the acts alleged, documentation of risky behavior, the alternative possible motives for movement (i.e. he has friends in another pod, etc.) [*Id*.]. Additionally, the feasibility of moving the inmate to a different location (i.e. does the inmate have known adversaries in another pod, does he need to be placed in maximum security, etc.) is a consideration [*Id*.].

It is common for inmates to request to be in a certain pod for reasons unrelated to their health and safety, and there are legitimate reasons why an inmate may not be transferred to another pod or cell simply because they have requested to be moved [*Id*. ¶ 8]. The Coffee County Jail denies refusing an inmate's transfer in order to "punish" an inmate [*Id*.].

Defendants contend that it is not the policy, practice, or custom of the jail to ignore threats to inmate safety, to ignore inmate grievances about safety, or to leave unpunished the inmates who engage in physical violence against other inmates [*Id*. at 3 ¶ 13]. Likewise, the Coffee County Jail does not have a custom of ignoring inmate complaints about violence from the guards [*Id*. ¶ 15].

Incident reports are kept by jail staff involved in an event, or with personal knowledge of the event, at or near the time of the occurrence [*Id*. ¶ 16]. Grievances are filed by inmates on the jail's kiosk system [*Id*. ¶ 17]. In 2017 (and presently), the kiosk system and all requests filed

thereon is managed by an outside company [*Id*.].  Therefore, according to the jail's Chief Deputy, there is no way for anyone at the jail to delete or otherwise manipulate the kiosk entries submitted by the inmates [*Id*. ¶ 18].

As noted above, the first grievance filed by Plaintiff concerning an inmate assault was on June 1, 2017, well after the alleged inmate assaults occurred [*Id*. at 4 ¶ 20].  There are no incident reports regarding any of the alleged inmate assaults or guard assault, and there is no video footage depicting any of the alleged assaults [*Id*. at 21-22].

When Plaintiff was transferred from AD pod on May 25, 2017, the record documenting the move states "MOVED PER CLASSIFICATIONS INMATE CANT LIVE IN ANY POD WHILE IN AD INMATE HAD ALTERCATION WITH OTHER INMATES 4462 JC FOR HIS PROTECTION DO NOT MOVE UNLESS CLASSIFICATION KNOWS" [Doc. 56-3].[1]  No records documenting the altercation mentioned in the movement note have been produced [Doc. 56-4 ¶ 2].

## IV.  DISCUSSION

In order to demonstrate liability under § 1983 as to any defendant, a plaintiff must first establish that the defendant acted under color of state law, and that his actions violated the rights secured by the Constitution and/or laws of the United States.  *See, e.g., Baker v. McCollan*, 443 U.S. 137, 140 (1979).  The plaintiff must also make a clear showing that the particular defendant was personally involved in the activity that forms the basis of the complaint.  *See Rizzo v. Goode*, 423 U.S. 362, 377 (1976).

---

[1] The Court presumes that the "JC" in this record refers to John Carroll, the classification officer with whom Plaintiff contends that regularly dealt [Doc. 49-5 p. 6; Doc. 56-2 ¶ 3].

## A.    Qualified Immunity

Defendants have pled the defense of qualified immunity. Qualified immunity protects governmental employees from individual, civil liability as long as their conduct does not violate clearly established "constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An evaluation of qualified immunity requires the Court to conduct a three-pronged inquiry: (1) whether there was a constitutional violation; (2) whether the violated right was "clearly-established;" and (3) whether the official's actions were objectively unreasonable. *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999). The Court may address these prongs in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

For a right to be clearly-established, "at the time of the officer's conduct, the law [must have been] sufficiently clear such that 'every reasonable official would understand what he is doing is unlawful.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Once qualified immunity has been pleaded by a defendant, the plaintiff bears the burden of rebutting the defense by showing both "that the challenged conduct violated a constitutional or statutory right, and that the right was so clearly established at the time of the conduct 'that every reasonable official would have understood that what he [was] doing violate[d] that right.' *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (citing *Ashcroft*, 563 U.S. at 741). In short, it is a defense that protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

### 1.    Failure-to-Protect Claims

As previously noted, Plaintiff was a pretrial detainee at the time of the events giving rise to this lawsuit. A pretrial detainee's Fourteenth Amendment due-process claim for a failure to protect is analyzed using the same standard as the Eighth Amendment. *See Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985); *see also Richko v. Wayne Cty.*, 819 F.3d 907, 915 (6th Cir. 2016)

("[The Sixth Circuit] has made clear that, under the Fourteenth Amendment, pretrial detainees are 'entitled to the same Eighth Amendment rights as other inmates'") (citing *Thompson v. Cty. of Medina*, 29 F.3d 238, 242 (6th Cir. 1994)).

Under the Eighth Amendment, a prison official has a duty to protect an inmate from violence caused by other prisoners. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Nelson v. Overberg,* 999 F.2d 162, 165 (6th Cir. 1993); *Walker v. Norris,* 917 F.2d 1449, 1453 (6th Cir. 1990). Thus, prison officials are required to "take reasonable measures to guarantee the safety of the inmates." *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Liability attaches to an officer's failure to protect an inmate only where the inmate demonstrates that he was "incarcerated under conditions posing a substantial risk of serious harm," and that the prison officials acted with deliberate indifference to the inmate's safety. *Farmer*, 511 U.S. at 834, 837. "Deliberate indifference" means that a prison official is liable only where he knows that the inmate faces a substantial risk of serious harm and disregards the risk. *Id.* at 837 (quotation marks omitted). Therefore, in order for liability to attach to a prison official's failure to protect, the substantial risk and need for protection must be obvious. *See, e.g., Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003).

Because of the subjective component necessary to establish failure-to-protect liability, an officer cannot be deliberately indifferent when an inmate is a victim of an unforeseeable attack. *Tucker v. Evans*, 276 F.3d 999, 1001 (8th Cir. 2002). Therefore, an officer's negligence or dereliction of duty cannot be the basis of a failure-to-protect claim. *See Daniels v. Williams*, 474 U.S. 327 (1986) (holding negligence does not state §1983 cause of action).

### a. Objective, Substantial Risk of Harm

The summary judgment evidence recounted above demonstrates that Plaintiff was booked into AD pod — a lower-level security pod that does not have a persistent or documented history

11

of inmate on inmate assaults and that permits inmates the opportunity to work. The pod is monitored by officers both on the floor and in watch towers. Plaintiff presented the jail with nonviolent charges, and he had no gang affiliation. That is, Plaintiff did not present with "high risk" factors or other special conditions that would have mandated that he be placed in protective custody at the time of his booking. Moreover, Plaintiff had been incarcerated in the Coffee County Jail on numerous occasions and had apparently never had altercations with any of the other inmates. Plaintiff has not, therefore, demonstrated that he was classified or placed inappropriately.

Additionally, general requests not to be placed in specific pod — absent a specific threat of assault — are not allegations that will support that a substantial risk of serious harm existed. *Stewart v. Love*, 696 F.2d 43, 45 (6th Cir. 1982). Plaintiff's expressed preference not to be housed in AD with the "snitches" is insufficient to demonstrate to any officer that he faced a likelihood of serious harm posed by the inmates who assaulted him.

Moreover, Plaintiff's preexisting problem with informants does not establish that the harm which allegedly befell him at the hands of another inmate was due to any interaction with the informants. On the contrary, Plaintiff attributes the assaults against him to his failure to turn over contraband to other inmates. Any inmate with a desired contraband (in this case, tobacco) is exposed to a potential risk of harm at the hands of other inmates. In this case, Plaintiff sneaked the contraband into the jail in his anus, a fact that was unknown to jail staff. Therefore, Plaintiff created a risk of harm to himself which was unknown by jail personnel, and the jail could not have protected Plaintiff from this unknown risk of harm. Accordingly, given the lack of evidence that Plaintiff was incarcerated under conditions that posed a risk of serious harm, he has failed to establish an Eighth Amendment claim.

### b. Subjective State of Mind

Plaintiff has also failed to demonstrate that a genuine dispute of material fact remains as to whether any named Defendant possessed the requisite state of mind to incur liability, as no reasonable jury could find that either Officer Carroll or Officer Strange were "deliberately indifferent to the substantial risk of harm" of housing Plaintiff in AD pod. *Farmer*, 511 U.S. at 835, 837-38 (holding deliberate indifference requires more than an ordinary lack of care for the prisoner's safety; it requires an official to know of and disregard an excessive risk to inmate health or safety).

### i). The initial placement

During booking, Plaintiff was unhappy with his placement in AD pod because of "snitches" in that pod. He admitted that his preexisting problems were not ones that would provoke violence, but rather, he expressed concern that he did not want to be "set up" [*See* Doc. 49-5 p. 3]. Significantly, Plaintiff never expressed to Officer Carroll that he had a concern or fear for his health or safety if he were to be placed in AD. Accordingly, the undisputed facts in the record demonstrate that to the extent Officer Carroll was involved in classifying and placing Plaintiff in AD pod, he did so without consciously disregarding any known risk of harm to Plaintiff.

### ii). Failure to transfer

With regard to the alleged assaults on May 15 and May 22, 2017, Plaintiff has not presented any evidence that Officers Carroll and Strange had reason to suspect that the assaulting inmates might harm or continue to harm Plaintiff, an individual to whom the inmates had no apparent connection. Significantly, the officers did not know of the underlying facts that might pose a danger to Plaintiff — i.e. that Plaintiff was in possession of contraband that the other inmates wanted, and that he continued to possess the contraband even after he claimed to have been assaulted over it.

The officers could have reasonably discredited the risk of assault to Plaintiff, as neither officer witnessed Plaintiff with any kind of injury, Plaintiff did not identify the individuals assaulting him, there were no identified witnesses to the alleged assaults, and no institutional records support that the assaults occurred. Despite alleging to having been assaulted three separate times, Plaintiff has not produced any corroborating proof that the incidents occurred as alleged.

Plaintiff attempts to discredit the officers' sworn testimony by pointing to his Jail Activity sheet, where it is reported that the inmate was "moved per classifications" after an altercation with other inmates [Doc. 56-3 p. 2]. The Court agrees that this document certainly indicates that something occurred between Plaintiff and other inmates in May 2017. However, the entry is from May 25, 2017, days after the last assault in this case allegedly occurred. Therefore, even if Officer Carroll was the one who entered this notation on May 25, 2017, it proves nothing as to what he knew and allegedly disregarded on the prior dates in May. Second, the report demonstrates that Plaintiff was indeed moved to a different pod as a result of his complaint, which negates his argument of deliberate indifference.

Additionally, Plaintiff claims that Officer Strange was deliberately indifferent towards Plaintiff's health and safety because he allowed Plaintiff to get assaulted for a second time, as he was working in the tower at the time of the second assault and took no action to protect him [*See* Doc. 56-2 ¶ 7]. However, according to Officer Strange, inmates cannot see into the tower as it is encased in a one-way viewing glass [Doc. 49-2 ¶ 12]. This dispute in facts aside, Plaintiff's allegations do not allow the Court to reasonably draw that conclusion that Officer Strange's presence in the tower meant that he witnessed the assault, consciously disregarded the danger, and chose not to intervene. Because an officer's failure to alleviate risk from which they should have perceived, but did not, is not actionable, *Farmer*, 511 U.S. at 837-38, 840, Officers Carroll and Strange are entitled to qualified immunity under a "failure to protect" theory.

### 2. Excessive Force

Plaintiff also claims that Defendant Liles "employ[ed] excessive force to assault a pretrial detainee," in violation of the Fourteenth Amendment, by slamming the metal hatch in Plaintiff's cell onto his arm [Doc. 1 p 5]. In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the Supreme Court held that a pretrial detainee's Fourteenth Amendment excessive-force claim need only meet the objective component by showing that "the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). A court must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene," rather than with "the 20/20 vision of hindsight." *Id.*

Plaintiff contends that the June 9, 2017, pie flap incident occurred, while Defendant Liles claims that it did not. While the summary judgment standard typically requires the Court to construe the evidence in the light most favorable to the non-moving party, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Booher ex rel. T.W. v. Montavon*, 555 F. App'x 479, 484 (6th Cir. 2014) ("This applies not only when there is videotape evidence, but whenever the nonmoving party's version is so blatantly contradicted by objective evidence in the record that it fails to create a genuine issue of material fact for trial." (quotation marks and citation omitted)). In this case, Plaintiff did not seek or receive medical treatment for the alleged injury, and there are no records or recordings supporting that the June 9, 2017, incident ever occurred. Accordingly, there are no genuine facts in the record supporting that the alleged assaults occurred, and Plaintiff's unsupported allegation is insufficient to defeat Defendants' motion for summary

judgment as to this issue. *Bell v. Ohio State Univ*., 351 F.3d 240, 253 (6th Cir. 2003) (holding that conclusory or unsupported allegations do not show a genuine issue for trial).

### B.    Coffee County, Tennessee

#### 1.    Constitutional injury

In considering any potential liability by Coffee County, Tennessee, the Court first notes that a governmental entity cannot be held liable for the actions of any of its officers if the officers did not violate a constitutional right. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). As the Court has already determined, Plaintiff has failed to prove that any Coffee County official committed any underlying constitutional violation related to his alleged assaults. Accordingly, Defendant Coffee County cannot be held liable for the actions or inactions of Coffee County personnel. *Id.*

#### 2.    Failure to protect from assault

Regardless, the Court notes that a suit against a defendant in his or her official capacity is treated as an action against the governmental entity the officer represents. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"); *Barber v. City of Salem*, 953 F.2d 232, 237 (6th Cir. 1992). In an action against an officer acting in an official capacity, "the plaintiff seeks damages not from the individual officer, but from the entity from which the officer is an agent." *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993).

A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978). However, a local governmental unit may be liable for civil damages in a § 1983 action when the execution of a governmental policy or the toleration of a custom causes the deprivation of a constitutionally protected right. *Doe v. Claiborne Cty., Tenn*., 103 F.3d 495, 507 (6th Cir.

1996) (citing *Monell*, 436 U.S. at 691). For a governmental entity to be liable for having a custom of inaction, Plaintiff must demonstrate (1) a clear and persistent pattern of constitutional violations; (2) notice, or constructive notice of such pattern to the governmental entity; (3) tacit approval of the deliberate indifference and failure to act amounting to an official policy of inaction; and (4) that the custom or policy of inaction was the "moving force" behind the constitutional injury. *Garretson v. Cty. of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005). The "deliberate indifference" in this context is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. A municipality can only be liable if the risk of a constitutional violation were plainly obvious." *Id.* (citation and internal citation omitted).

Here, Plaintiff was allegedly assaulted by inmates for refusing to give up or share contraband. Defendant Coffee County did not have any policy, practice, or procedure that would have either caused or prevented Plaintiff's assault based on these circumstances. In fact, Plaintiff could have been at risk for assault in any pod that he was placed in due to the desire for tobacco in jail. Nonetheless, the competent summary judgment evidence in this case show that (1) the officers were not made aware of the assaults; (2) the officers were not made aware of the individuals who were causing harm to Plaintiff; (3) the officers were not made aware of the fact that Plaintiff had tobacco; and (4) the officers did not see Plaintiff with any injury. Accordingly, the Court finds that Coffee County did not have any policy, practice, or procedure that caused Plaintiff's assault. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).

Likewise, Coffee County cannot be liable for any "custom of inaction," as Plaintiff has not shown "a clear and persistent pattern" of similar constitutional violations. *Garretson*, 407 F.3d at 796; *see also Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 508 (6th Cir. 1996). Plaintiff has submitted no proof of a clear and persistent pattern of

"failure to protect" an inmate from fellow inmates. Additionally, Plaintiff has not presented proof that Coffee County tacitly approved any deliberate indifference such that it amounted to a custom of inaction, or that this alleged custom or policy of inaction was the "moving force" or direct causal link, behind the alleged constitutional injury. *Garretson*, 407 F.3d at 796; *Doe*, 103 F.3d at 508. Accordingly, Coffee County may not be held liable under a "custom of inaction theory."

### 3. Failure to train/supervise

The inadequacy of a training policy "may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of a person with whom the police come into contact." *City of Canton*, 489 U.S. at 388. Explaining this "deliberate indifference" necessary to support a claim of failure to train, the Supreme Court has stated:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390 (footnote omitted). A plaintiff must identify a particular deficiency in the training program and prove that the identified deficiency was the actual cause of the plaintiff's constitutional injury. *Id.* at 390-91. It is not enough to establish that a particular officer, even the defendant in question, was inadequately trained, nor that there was negligent administration of an otherwise adequate program, nor that the conduct resulting in injury could have been avoided by more or better training. *Id.*; *see also Carey v. Helton*, 70 F. App'x 291, 294 (6th Cir. 2003).

Plaintiff's theory that Coffee County is subject to liability based on its failure to supervise is a theory that consists of three elements: (1) that the individual defendants' training or supervision was inadequate for the tasks that officers in their position must perform; (2) that the inadequacy persisted due to the County's deliberate indifference; and (3) that the inadequacy is closely related

to or actually caused the plaintiff's injury.  *Harvey v. Campbell Cty., Tenn.*, 453 F. App'x 557, 562 (6th Cir. 2011) (citing *Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)).  To establish the second element, deliberate indifference, Plaintiff must either present evidence of prior instances of unconstitutional conduct demonstrating that the County ignored notice that the training was deficient and likely to cause injury, or evidence of a "single violation of federal rights, accompanied by a showing that the County had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation."  *Id.*

Plaintiff contends that Coffee County was previously sued for similar apathy to another prisoner's safety, and that testimony from that other inmate, Blake Cretacci, reflects that he likewise asked to be moved on multiple occasions because he experienced problems with the inmates in his pod, apparently for failing to participate in a riot with those other inmates [Doc. 56-9 p. 24, 28-29].  Despite these requests, he was not moved and was then assaulted twice on the same day, October 11, 2015, after the guards allegedly witnessed the end of the first altercation but failed to discipline the offenders [*Id.* at 20].  An August 29, 2017, incident report involving another inmate, Jeremiah Allsopp, shows that this inmate actually warned guards that there was going to be an altercation between himself and his cellmate unless he was moved, but the guards decided "there really was no problem" [Doc. 56-6 p. 2].  After the inmate then demanded a change of cells and allegedly threatened and cursed the officer, the officer restrained Allsopp and escorted him to his cell [*Id.*].  On December 2, 2019, regarding another inmate named Danny Jacobs, judgment was entered against Coffee County for excessive force occurring at the jail on October 8, 2018 [Docs. 56-7 and 56-8].

The Court finds that the cases cited by Plaintiff are few, and that they appear to involve largely dissimilar instances.  A plaintiff must prove that there were "several separate instances" of unconstitutional conduct or illegal activity that are similar to the alleged unconstitutional conduct

or illegal activity of the case at bar. *Thomas v. Cty. of Chattanooga*, 398 F.3d 426, 430, 432-34 (6th Cir. 2005) (finding 45 civil lawsuits against governmental entity did not create a genuine issue of material fact that the governmental entity failed to train its officials to such a point that excessive force became its policy). Accordingly, the Court finds that these instances set forth by Plaintiff are insufficient to set forth a custom "so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691 (internal quotation marks omitted).

Furthermore, the evidence presented to the Court demonstrates that Coffee County Jail Classification officers receive TCI training and additional training on how to classify and place inmates based on a variety of factors. All requests to be transferred are reviewed by higher-ranking officers for validity and are only granted by those with the proper authority. Additionally, Coffee County officers are trained on how to report and handle inmate requests to be transferred. Plaintiff has not presented any evidence that the training received by any officer in this case was in any way inadequate. Plaintiff has not demonstrated that there is a genuine issue of material fact that the training or supervision of the corrections officers caused, or that would have prevented, the alleged inmate assaults on Plaintiff.

Finally, Coffee County cannot be liable because any failure to train or supervise did not cause Plaintiff's alleged injuries. *Carey,* 70 F. App'x at 294-95 (citation omitted). Plaintiff's alleged injuries were caused by his own actions of sneaking tobacco into the jail. There is no proof that his injuries could have been avoided if an officer had received different training or supervision on how to deal with such circumstances. Accordingly, Coffee County cannot be held liable under § 1983 based on a failure to train or supervise theory.

### C.    Absence of Constitutional Injury

Under the Eighth Amendment, "a violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused injury." *Horn v. Madison Cnty.*

*Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994). The proximate cause of Plaintiff's injuries were his own actions in bringing contraband into the jail, failing to tell officers why he was the subject of assault, not telling the officers the names of the assaultive inmates, and not timely reporting the assault. Accordingly, Plaintiff has not proven that any alleged constitutional violation was the proximate cause of his injuries.

Additionally, a Plaintiff must establish more than a *de minimis* injury in order to state an actionable claim. *See Adams v. Rockafellow*, 66 F. App'x 584, 586 (6th Cir. 2003). While Plaintiff contends that he was punched, kicked, and beaten multiple times within a two-week period, he waited over a week to file a grievance requesting medical attention, in which he complained of broken ribs, broken pelvis, knee pain, back pain, left ear pain, allergies, and shortness of breath [Doc. 49-4 p. 36]. When he was evaluated by a medical professional, however, his evaluation revealed no injury to his head, face, or other part of his body [Doc. 59-1 p. 4, 5, 7]. A pelvic x-ray disproved any injury to his hip, and his oxygen levels suggested he had no difficulty breathing [*Id*.]. The provider found, in fact, that he did not even have a bruise [*Id*. at 3]. The provider concluded that Plaintiff was malingering, meaning that he was "pretending to have conditions which he does not have" [*Id*. at 2]. Thus, the bald claim that Plaintiff sustained an injury greater than *de minimis* as a result of the alleged constitutional violations is insufficient to meet the standards of an Eighth Amendment claim. *See, e.g., Iqbal*, 556 U.S. at 681.

## V.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [Doc. 49] will be

**GRANTED**, and this action will be **DISMISSED WITH PREJUDICE**.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER**.


s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE